**UNITED STATES of America ex rel. Mario ARENA, Petitioner,**

v.

**The PEOPLE OF the STATE OF NEW YORK and Eugene Gold, as District Attorney of Kings County of the State of New York, Respondents.**

**No. CV 80–1223.**

United States District Court, E. D. New York.

Sept. 22, 1980.

Leonard M. Simon, P. C., New York City, for petitioner; Peter R. Silverman, New York City, of counsel.

Eugene Gold, Dist. Atty., Brooklyn, N. Y., Robert Abrams, Atty. Gen. of the State of New York, New York City, for respondents; Michael J. Halberstam, Asst. Dist. Atty., Brooklyn, N. Y., of counsel.

## MEMORANDUM & ORDER

PLATT, District Judge.

On February 22, 1979, Mario Arena was convicted of four counts of second degree grand larceny, in violation of New York Penal Law § 155.05[1] (McKinney's 1975)[1] in Supreme Court, Kings County. He was sentenced to four concurrent terms of three years' imprisonment and fined $28,000.00. Without opinion, the Appellate Division, Second Department, entered an order dated December 31, 1979, modifying the judgment of the trial court by vacating the sentence of imprisonment and substituting a sentence of sixty days' imprisonment and a probation term of four years and ten months. The New York Court of Appeals (Meyer, J.) denied leave to appeal on April 23, 1980.

Mr. Arena now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1976), alleging that he is entitled to relief on three grounds of constitutional magnitude. First, he argues that he was denied due process of law in violation of the Fourteenth Amendment by the prosecution's knowing use of perjured testimony in its direct case. Second, he contends that he suffered a separate denial of due process in that the trial judge delivered a "woefully inadequate charge", omitting critical elements of the offense charged and failing to accommodate a complex factual context with proper elaboration. Third, he alleges that the evidence adduced at trial was insufficient as a matter of law to sustain a finding of guilt beyond a reasonable doubt on each and every element of the offense charged.

The record before us indicates that Mr. Arena has satisfied both the jurisdictional predicate[2] and the exhaustion of State remedies requirement[3] of § 2254, and the peti-

1. Subsection 1 of § 155.05 of the New York Penal Law provides that

   A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.

2. Subsection (a) of § 2254 of Title 28 of the U.S.C. provides that

   The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

3. Subsections (b) and (c) of § 2254 of Title 28 of the U.S.C. provide as follows:

   An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering

tion is thus properly before this Court. For the reasons stated below, we determine that Mr. Arena is entitled to independent relief on the second of his three grounds; we do not pass on the third and we question his right to relief on the first. Accordingly, we grant the petition and order that the writ issue, subject to the State's right to re–try Mr. Arena within 90 days.

## I

The evidence in this case was, as Mr. Arena contends, fairly complicated. The following brief summary of the facts has been gleaned from the 1234–page record on appeal, the parties' appellate briefs, and the papers filed in this Court for and against the petition.

Since 1950 Mr. Arena has been a custodian for the Board of Education of the City of New York (hereinafter, "the Board"). During the period in issue in his prosecution, September 1975 through December 1976, he was the custodian at John Jay High School in Brooklyn. Mr. Arena describes the position as that of a "quasi–independent contractor", Petition at 3; Petitioner's Memorandum of Law at 3, who receives an annual budget from the Board to run his assigned school facilities. The custodian's budget is not strictly related to the actual operating expenses of the school, but is based on a formula including such factors as square footage and projected use by its usual occupants and community organizations. The custodian is responsible for using his budget, which is paid to him in bi–monthly installments, to hire his own staff and to heat, clean, and maintain the facility. The custodian derives his compensation each year by retaining the difference between his allotment from the Board and his expenses.

The State contended that a contract negotiated in 1965 between the Board and the Custodians' Union limited a custodian's earnings to a maximum of $31,000 per year.

Any amounts retained by the custodian exceeding $31,000 had to be remitted to the Board. Proceeding from this limitation, the State based its prosecution on the theory that Mr. Arena intentionally retained an excess during the period in question by employing at various times within the period four part–time "firemen" who actually did not appear for work at all their scheduled times. These employees then allegedly "kicked back" all or a portion of their salaries to Mr. Arena, resulting in a retention by Mr. Arena of an amount in excess of the custodians' contractual limitation.

The State relied wholly on circumstantial evidence to prove its case at trial. To establish the nature of the alleged contractual relationship between Mr. Arena and the Board, the State relied on the testimony of a former Director of Plant Operations for the Board, but did not introduce the 1965 contract nor did it offer proof that Mr. Arena was a signatory thereto or legally bound by the contract in any other way. To prove that the four employees were indeed "no–shows", the State adduced testimony from some other custodial staff employees to the effect that they had never seen the employees working at the High School. As the defense points out, however, the State never called the foreman of the four employees. The State also produced an expert witness who testified about methods of fabricating time cards, in order to raise the inference that the four employees' time cards had been fabricated to conceal the fact that they had not punched in and out on a daily basis.

To link the arrangement to Mr. Arena, and presumably to raise the inference of the requisite intent, the State introduced evidence to show that some of the four employees' payroll checks had been endorsed over to Mr. Arena and deposited in various accounts under the names of Mr. Arena and his wife. The State further

---

such process ineffective to protect the rights of the prisoner.

An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

*See also, Picard v. Conner*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

adduced rather technical accounting evidence to show that the result of the alleged arrangement was to leave Mr. Arena with an amount in excess of the contractual limitation for the fifteen–month period. The latter proof was made more complex than it might otherwise have been because other evidence showed that the Board was often late with its allotment payments to Mr. Arena. This necessitated testimony relating to the proper accounting method–cash or accrual–with which to compute the amounts actually retained by Mr. Arena. The prosecution claimed that the accrual method was proper, but this, of course, gave rise to the claim that no larceny could occur until refunds on a cash basis were due.

The defense rested at the close of the prosecution's case without calling any witnesses. The trial court then granted a defense motion to dismiss eleven counts of third degree grand larceny which related to smaller, specific amounts allegedly retained by Mr. Arena within the overall fifteen–month period. Following the Court's charge, described more fully *infra*, the four remaining second degree counts were submitted to the jury. The jury returned a verdict of guilty on each of the four counts, finding that Mr. Arena had stolen funds in the requisite amount by acting in concert with the four "no–show" employees.

## II

The United States Supreme Court, in the case of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), stated:

"Lest there remain any doubt about the constitutional stature of the reasonable–doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction' except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

397 U.S. at 364, 90 S.Ct. at 1073. Similarly, in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, at 2788, 61 L.Ed.2d 560 (1979), the Court said:

". . . In short, *Winship* presupposes as an essential of the due process guar-anteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof–defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."

It is axiomatic that unless the jury is informed as to each' element of the offense it will not be in a position to make the requisite findings so required by the Supreme Court.

In the case at bar, while the Court read § 155.05[1] of the New York Penal Law to the jury and defined property in accordance with § 155.00[1], it did not set forth the essential elements of the crime which the Government was required to prove beyond a reasonable doubt, and, in particular, it did not define for the jury the meaning of the words "deprive", "appropriate" and "owner", all of which were material to the offense claimed to have been committed by the defendant herein.

The word "deprive" is defined in § 155.-00[3] as follows:

To "deprive" another of property means (a) to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (b) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property.

The word "appropriate" is defined in § 155.00[4]

To "appropriate" property of another to oneself or a third person means (a) to exercise control over it, or to aid a third person to exercise control over it, permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or (b) to dispose of the property for the benefit of oneself or a third person.

And the word "owner" is defined in subdivision 5 of such section as:

"When property is taken, obtained or withheld by one person from another person, an 'owner' thereof means any person who has a . right to possession thereof superior to that of the taker, obtainer or withholder."

There was clearly an issue of fact in the trial of this case whether the defendant was withholding funds from the Board of Education permanently. Petitioner points out here in his Brief at 9–10, for example, that:

the People's expert accountant testified that in calendar year 1976 the defendant received a total of $248,982.04 from the Board of Education and incurred expenses in the total amount of $237,695.06 leaving a difference of $11,286.98 for such period. (Record on Appeal, page 749–750) For the period of October through December of 1975, the defendant received a total of $62,392.30 from the Board of Education and incurred expenses in that same period of $69,986.08, leaving a deficit of $7,593.78 which the defendant was required to pay out of his own pocket in order to perform his custodial tasks. The foregoing figures clearly indicate that it was impossible for the defendant to commit a larceny during the period of 1975 and 1976 and that the People sought to rely upon a complicated method of accounting by accrual in order to prove their case, which method it is submitted neither the Court nor the jury comprehended. The reason for the discrepancy is that the computer card is based on a hypothetical situation whereby a custodian would receive all money earned in one calendar year. Actually the Board of Education as a rule was 30 to 60 days behind in their payments and therefore for income purposes the custodian made substantially less for the calendar year as evidenced by the testimony of the People's accountant Seymour Baldinger and the testimony of Mr. Hudson. (See Hudson's testimony page 156).

The Practice Commentaries under § 155.-00 significantly state that:

"The definitions of subdivisions 3 and 4 are essential to a definition of larcenous intent, consisting of an intent to 'deprive' or 'appropriate' (see § 155.05[1]). The thrust of these terms is that they connote a purpose on the part of the thief to exert permanent or virtually permanent control over the property taken, or to cause permanent or virtually permanent loss to the owner of the possession and use thereof. . . . ."

As indicated, there was no discussion of this essential element in the Court's charge.

In addition, there is also a serious question of ownership of the funds in this case because necessarily if the petitioner was the owner thereof he could not be said to have stolen the property and committed the alleged larceny. Again as the Practice Commentaries state:

"It is a generally accepted principle that, in the larceny area, 'ownership' of property means 'possession' thereof, and that a person has possession of property when he has any legally recognizable interest therein (52 C.J.S. § 13, p. 811)."

Since Mr. Arena's conviction of February 22, 1979, the New York Court of Appeals has, in two important cases, interpreted § 155.05 of the New York Penal Law. *People v. Yannett*, 49 N.Y.2d 296, 425 N.Y.S.2d 300, 401 N.E.2d 410 (1980), and *People v. Keeffe*, 50 N.Y.2d 149, 428 N.Y.S.2d 446, 405 N.E.2d 1012 (1980).

In the *Keeffe* case, the Court of Appeals held that an attorney, who holds in a special account the proceeds of the settlement of a personal injury action, was not guilty of larceny when his withdrawals from the special account reduced its balance to less than the amount to which his predecessor attorney had been held entitled by a Court order as his share of the fee since the funds were not trust funds being held for the benefit of the predecessor attorney.

In the *Yannett* case, the Court of Appeals held that where a nursing home operator had been paid monies by residents of the Home for care pending notification of the residents eligibility for medicare assistance, and had failed to make refunds to certain of the residents after notification of their eligibility for medicare in violation of the

Medicare Provider Agreement, he could not be convicted of the crime of larceny by embezzlement because "the money which defendant had been convicted of stealing never belonged to the residents of [this] nursing home, nor was it entrusted to defendant to hold on behalf of the residents." (49 N.Y.2d at 302, 425 N.Y.S.2d at 302, 401 N.E.2d at 412).

Thus one of the key questions or elements in a case such as this is who was the "owner" of the allegedly stolen property.

In this case, although no written contract between the Board of Education and the petitioner was offered or admitted in evidence, Raymond G. Hudson, a former director of plant operations for the Board of Education of the City of New York, who administered the custodial work force, testified that:

Q. How does the custodian carry out all those functions?

A. The custodian has an annual compensation which includes sufficient funds to hire personnel to assist him in operating the building. He will hire his own employees to do certain jobs . . . (104–105)

Q. Who is it that pays the school custodian?

A. The school custodian is paid by the Board of Education . . .

Q. What form does that payment take?

A. For the day school compensation he is allowed an allowance, an annual allowance, depending on the size of the building and certain other factors and every other Thursday he would receive a check for $^{14}/_{365}$'s of the allowance.

Q. In other words, they take the total allowance for the year and multiply that by $^{14}/_{365}$ths?

A. Yes.

Q. Whatever that amount is they send it to the custodian every other week?

A. He gets that every other Thursday.

Q. Is that a payroll check?

A. That is a custodial payroll check, yes . . . (119–120)

     \*    \*    \*    \*    \*    \*

Q. Mr. Hudson, you stated there was a limitation on the amount of profits that a custodian would make. I want to ask you, sir, is there any limitation on the amount of money he could lose working as a custodian?

A. No there is no minimum amount that he would be paid.

Q. In other words, he is working at his own risk, to some degree; is that correct, sir?

A. To some degree, yes, he is working at his own risk.

Q. Excuse me. The semi–weekly paycheck or the bi–weekly paycheck that the custodian receives, sir, is there any restriction on it with respect to what type of checking account he could deposit that check into, please, in 1975 and '76?

A. 1975 and 6, no.

Q. Is it not a fact, sir, it was the custom of some custodians to place the Board of Education checks into their own, shall we call it, personal checking accounts?

A. It would just be a guess on my part . . .

Q. Is it also not a fact, sir, that custodians during the course of the school year actually on various occasions are required to take money out of their pocket to pay expenses and wages in anticipation of or prior to the times that the Board of Ed catches up and mails their checks to them?

A. On certain things, yes, they would have to advance money to operate the building, and then would be reimbursed at a point maybe a month or two months later.

Q. Is it not a fact sir that there are occasions where custodians have layed out as much as $10,000 to $15,000 prior to the time that the Board of Ed has mailed the necessary funds to them?

A. Yes (155–156).

From these statements it seems clear that if the trial court did not think that the petitioner was the "owner" of the funds as a matter of law, at the very least such court should have submitted the issue to the jury as one of fact under appropriate instructions. *See People v. Yannett,* and *People v. Keeffe.*

These errors are, in this Court's opinion, sufficient to require the issuance of the writ of habeas corpus unless the State Court accords petitioner a new trial within 90 days from the date hereof.

In light of the foregoing and, in particular in light of the new interpretations of the New York Larceny Law by the New York Court of Appeals, this Court is reluctant to and indeed should not undertake an inquiry into the question of the sufficiency of the evidence under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), before a jury under proper instructions has done so. Such a jury, of course, may well decide the issues of fact in such a manner as to moot this question.

■ With respect to petitioner's complaint about the prosecution's use of "prejurious" testimony citing the case of *DuBose v. LeFevre,* 619 F.2d 973 (2d Cir. 1980) and cases set forth therein, suffice it to say that although the use of "uncorrected" perjured testimony favorable to the prosecution by the prosecutor may constitute a deprivation of due process, it does not appear that the "perjurious" testimony proffered here was favorable to the prosecution nor did it stand "uncorrected" since the prosecution stressed its falsity in their summation.

Let the writ issue unless petitioner is granted a new trial within ninety (90) days hereof.

SO ORDERED.